NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0497n.06

No. 10-1799

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| SUSAN GOLDFADEN, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellant, | ) | **May 14, 2012** |
| | ) | LEONARD GREEN, Clerk |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Eastern |
| WYETH LABORATORIES, INC., and | ) | District of Michigan |
| ROBERT MONOVICH, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before:     KEITH, MARTIN, and BOGGS, Circuit Judges.

**BOGGS, Circuit Judge.**   Goldfaden filed suit against Wyeth Laboratories and her supervisor, Chris Monovich, alleging sex discrimination under Title VII of the Civil Rights Act of 1964, sex discrimination under the Michigan Elliot-Larsen Civil Rights Act ("ELCRA"), a breach of contract/legitimate expectations, and a public-policy tort.  The district court granted summary judgment in favor of defendants on all claims.  We affirm.

**I**

Goldfaden worked as a district manager in Wyeth's psychiatry division, supervising ten psychiatry specialty managers, who were responsible for promoting products to doctors.  Goldfaden reported to Chris Monovich, the area business director.  Goldfaden told Monovich that one of her subordinates, Sean Cleveland, violated Wyeth policy 511, which prohibits employees from

communicating certain matters to health-care providers.[1]  Goldfaden claimed that Cleveland had an unapproved discussion with a doctor about an on-going study known as STAR*D, which involved a Wyeth product not yet approved by the FDA.  Cleveland admitted to Monovich that he violated the policy, but claimed that Goldfaden knew about his plan to discuss STAR*D.  Cleveland further said that he witnessed Goldfaden talking with doctors about other products not yet approved by the FDA.

After an internal review–which Monovich did not participate in beyond submitting the initial allegations of malfeasance—the compliance office found that both Goldfaden and Cleveland had violated policy 511.  Cleveland received a warning letter as a reprimand.  The legal and compliance offices recommended that Goldfaden should be terminated, though Monovich and another supervisor "dissuaded" compliance from terminating her.  R.73-43, CM Dep. 165.  Wyeth decided that Goldfaden would also receive a warning letter.

On September 12, 2006, Monovich gave Goldfaden a warning letter that he had prepared.  The letter limited her performance level for the year, as determined by a review at the end of the year, to no higher than a "3-At Expectations" (on a scale of one to five).  Three weeks after receiving the warning letter, Goldfaden resigned from Wyeth, and accepted a higher-paying position at Schering-Plough, a competitor pharmaceutical company.  Goldfaden resigned before the end of the year, when she would have been evaluated for purposes of determining her bonus.

---

[1] For example, employees are not allowed to use any promotional materials that are not approved by the Wyeth Copy Clearance Committee. They are not permitted to use off-label promotions (promoting a drug for a purpose other than that discussed on the package insert). Further, employees cannot discuss products or dosages not approved by the FDA.

**II**

**A**

The district court granted summary judgment in favor of defendants on allegations of sex discrimination. First, the district court held there was no adverse employment action. The district court held that Goldfaden failed to establish the elements of a constructive discharge, noting that she "appears to have become frustrated with her work situation and resigned voluntarily." *District Ct. Op.* at 18. Further, the district court held that merely receiving a warning letter did not constitute an adverse employment action, because it did not involve a change in salary, work hours, or responsibility—the letter only concerned raises, bonuses, or stock options, which were variable. Without showing an adverse action, the court held that Goldfaden failed to establish a prima facie case. Alternatively, the district court held that "[e]ven if Plaintiff could make out a prima facie case, she cannot show that Defendants' non-discriminatory reason for issuing the warning letter was pretextual." *Id.* at 27. Goldfaden "failed to establish that she was treated differently than similarly situated males, and hence, does not establish a prima facie case." *Ibid.*

**B**

The court held that plaintiff's breach of contract/legitimate-expectations claim failed because Goldfaden could not show that "she had a just cause contract or that she was discharged." *Id*. at 33. Finally, the district court rejected Goldfaden's claim that the receipt of the warning letter was contrary to public policy—the so-called public-policy tort. On appeal, Goldfaden does not contest the district court's dismissal of her legitimate-expectations claim.

No. 10-1799
*Goldfaden v. Wyeth Laboratories, et al.*

A trial court's decision to grant a summary judgment motion is subject to de novo review. *Kleiber v. Honda of Am. Mfg. Inc.*, 485 F.3d 862, 868 (6th Cir. 2007).

**III**

Goldfaden's single-motive[2] disparate treatment claim is subject to the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[3] Plaintiff must first establish a prima facie case of sex discrimination. In order to establish a prima facie case, Plaintiff must produce evidence sufficient to show that "(1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably." *Vincent v. Brewer Co.*, 514 F.3d 489 (6th Cir. 2007) (citing *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004)). A plaintiff who establishes a prima facie case of discrimination receives the benefit of a presumption that the employer unlawfully discriminated against her. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004) (citing *Texas Dept. of Commun. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).

---

[2] On appeal, Goldfaden tries to fashion this case as a mixed-motive disparate treatment claim. *Appellant Br.* at 13. In the district court, Goldfaden raised this case as a single-motive case. In her motion for summary judgment, she applied the single-motive *McDonnell Douglas* analysis. R.80, p. 26-28. "Issues that are not squarely presented to the trial court are considered waived and may not be raised on appeal." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1172 (6th Cir. 1996). This appeal is analyzed under *McDonnell Douglas* as a single-motive case

[3] Claims of discrimination brought pursuant to the ELCRA are analyzed under the same evidentiary framework as claims of discrimination brought under Title VII. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999).

If the plaintiff successfully establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Ibid.* (citing *Burdine*, 450 U.S. at 253; *McDonnell Douglas*, 411 U.S. at 802). Should the defendant carry this burden, the plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but were a pretext for discrimination. *Ibid.* At all times, the plaintiff bears the ultimate burden of proving that unlawful discrimination took place. *Ibid.*

Defendants do not dispute that Goldfaden is a member of a protected class or that she was qualified for her position. However, they (1) argue that she did not suffer an adverse action, (2) deny that she was treated different from similarly situated males, and (3) deny that their reasons for issuing her a warning letter were pretextual.

**A**

There are two potential adverse actions—an allegation of constructive discharge, and the issuance of the warning letter. Goldfaden fails to establish that she was constructively discharged. However, the warning letter did constitute an adverse action.

**1**

The district court correctly held that Goldfaden was not constructively discharged. To demonstrate constructive discharge, a plaintiff must adduce evidence to show that (1) "the employer . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable person," (2) the employer did so "with the intention of forcing the employee to quit," and (3) "the employee . . . actually quit." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999). "To determine if there is a constructive discharge, both the employer's intent and the

employee's objective feelings must be examined." *Ibid.* (citing *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)).

Goldfaden asserts that her career was set back because of the warning letter. Further, she was asked to continue in her role as Cleveland's manager after their disputes. She feared that another complaint from Mr. Cleveland could result in her termination. This untenable situation, she claims, left her no choice but to resign. Goldfaden does not show that Wyeth intentionally created these working conditions.

If anything, they were unavoidable in light of Goldfaden's own misconduct—a point she seems to completely ignore. Both Goldfaden and her subordinate violated a company policy, for which both were punished in the same manner. Undoubtedly, after a serious reprimand based on an employee's misconduct and that of a subordinate, the workplace environment can become tense. But Goldfaden cannot show that Wyeth or Monovich "deliberately create[d] intolerable working conditions." Further, Goldfaden cannot show that these conditions were created "with the intention of forcing [her] to quit." If anything, the warning letter and resulting circumstances were designed to spare her termination—the legal and compliance offices wanted to fire her for violation of policy 511, but Monovich insisted she keep her job—not to make her quit. Goldfaden cannot rely on a constructive discharge to constitute an adverse action as part of her prima facie case.

**2**

The district court erred in finding that the warning letter did not constitute an adverse action. For an act to be considered an "adverse employment action," there must be an action that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment

with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). This court has held that "a negative performance evaluation does not constitute an adverse employment action, unless the evaluation has an adverse impact on an employee's wages or salary." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir.2007). To prove an adverse employment action, "[a]t a minimum, the plaintiff must point to a tangible employment action that she alleges she suffered, or is in jeopardy of suffering, because of the downgraded evaluation." *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 789 (6th Cir. 2000). *See also White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008).

Goldfaden's case presents a slight wrinkle. She received a warning letter in September that limited her year-end performance evaluation to a three on a scale of one to five. However, she never made it to the year-end evaluation, as she resigned three weeks after receiving the evaluation. The parties dispute what the effect of the lower evaluation would have been. Goldfaden asserts that she automatically would have received a lower bonus than her performance would otherwise have warranted, and would have been ineligible for other benefits. Defendants assert that the bonuses are discretionary, and that thus the ceiling on her bonus may not have been meaningful. In any event, Goldfaden cannot prove that she actually lost anything—but that is not the appropriate standard.

At the least, Goldfaden showed that she was "in jeopardy of suffering" a "tangible employment action" as a result of the warning letter which "downgraded [her] evaluation." *Morris*, 201 F.3d at 791. We cannot know for sure what would have happened, but there was a possibility that she would have received a lower bonus. This doubt is sufficient to survive summary judgment

on this point. A reasonable jury could have found that the warning letter constitutes an adverse action. However, even if the warning letter constitutes an adverse action, Goldfaden fails to show she was treated differently than other similarly situated males.

**B**

Goldfaden claims that Monovich treated women differently, or more harshly, than similarly situated male employees, and treated male employees more favorably than similarly situated female employees. "[T]o make a comparison [between the] discrimination [a] plaintiff [alleges] to that of [nonprotected employees], the plaintiff must show that the 'comparables' are similarly-situated *in all respects*." *Mitchell v Toledo Hosp.*, 964 F. 2d 577, 583 (6th Cir. 1992). This court has held that a plaintiff is "simply require[d] . . . [to] demonstrate that he or she is similarly[ ] situated to the non-protected employee in all *relevant* respects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998). To be deemed "similarly situated," the individuals with whom the plaintiff seeks to compare her treatment must have: (1) "dealt with the same supervisor"; (2) "been subject to the same standards"; and (3) "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583. Goldfaden identifies several incidents to demonstrate that other women were treated more poorly than men. None of these incidents show that Monovich treated similarly situated male employees differently than Goldfaden. Further, these incidents do not concern Goldfaden herself, or the misconduct investigation and resolution at issue here. Because this is not a hostile work environment case, these claims are irrelevant.

**C**

Even if Goldfaden could show that she was treated differently from other similarly situated male employees, she fails to establish that the reasons given for her discipline were pretextual. A plaintiff may establish pretext by showing that "(1) the stated reasons had no basis in fact; (2) the stated reasons were not the actual reasons; or (3) that the stated reasons were insufficient to explain the defendant's actions." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000). She fails to show any of these conditions.

The reason for the issuance of the warning letter had a strong basis in fact—namely, that she violated company policy, as determined by the appropriate company office after a careful investigation. Goldfaden cannot show that her misconduct was not the actual reason for the warning letter. Citing isolated instances of alleged conduct by Monovich, who did not make the disciplinary decision, does not meet this burden. The reasons for Wyeth disciplining her were quite clear, as she violated an important company policy. Wyeth undertook three separate investigations and interviewed thirteen witnesses, including Goldfaden. Its investigations and deliberative process were more than sufficient to support Wyeth's good-faith decision to issue plaintiff a Warning Letter.

**D**

Goldfaden's claim for disparate impact fails. She cannot show that she was treated differently from a similarly situated male employee. Further, she cannot prove pretext.

**IV**

Although an "at will" employee ordinarily may be terminated by an employer at any time and for any reason, Michigan allows lawsuits for discharges that are "so contrary to public policy as to

be actionable." *Suchodolski v. Mich. Consol. Gas Co.*, 412 Mich. 692, 316 N.W.2d 710, 711 (Mich. 1982). A claim of discharge in violation of public policy may rest on one of three grounds: (1) "the employee is discharged in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty"; (2) "the employee is discharged for the failure or refusal to violate the law in the course of employment"; or (3) "the employee is discharged for exercising a right conferred by a well-established legislative enactment." *Edelberg v. Leco Corp.*, 236 Mich. App. 177, 599 N.W.2d 785, 786-87 (Mich. Ct. App. 1999) (citing *Suchodolski*, 316 N.W.2d at 711-712).

Goldfaden brought two claims in her amended complaint with respect to the public-policy tort. R. 24, pp. 10-11. First, she claimed that "Wyeth improperly investigated and disciplined her in retaliation for not remaining silent." *District Ct. Op.* at 34. Or, stated more simply, Wyeth disciplined her in retaliation for telling her supervisors about Cleveland's misconduct. The district court rejected this claim.

Her first argument relies on two cases that are no longer good law. *Watassek v. Mich. Dep't of Mental Health*, 143 Mich. App. 556, 372 N.W.2d 617 (1985); *Meury v. Connie Kalitta Servs./Am. Int'l Airways, Inc.*, 181 F.3d 102 (Table), 1999 WL 357774, at *2 (6th Cir. May 20, 1999). The law on which these cases were decided has been superseded by Michigan's Whistleblowers' Protection Act ("WPA"), Mich. Comp. Laws § 15.361 *et seq.*, which provides the exclusive remedy for employees terminated in retaliation for reporting violations of law.

In *Cushman-Lagerstrom v. Citizens Insurance Company of America*, this court held that "Michigan does not recognize a common law cause of action for an employee who has been

discharged for reporting violations of law to a superior." 72 F. App'x 322, 330 (6th Cir. 2003). The court noted that though *Watassek* held that a common-law "public policy claim for discharge in retaliation for reporting violations to a superior" was available prior to the enactment of the WPA in 1981, the opinion was "silent as to whether such a common law claim survived the WPA's passage." *Ibid.* This court noted that *Wassatek's* rule was limited to "discharges occurring before the WPA's passage in 1981." *Ibid.* The Michigan Supreme Court recognized this limitation in *Dudewicz v. Norris-Schmid, Inc.*, 443 Mich. 68, 503 N.W.2d 645, 650 (1993), "where it held that the WPA now provides the exclusive remedy for employees terminated in retaliation for reporting violations of law." *Cushman-Lagerstrom*, 72 F. App'x at 330.

The district court properly relied on *Cushman-Lagerstrom* and *Whiting v. Allstate Ins. Co.*, No. 08-12991, 2010 WL 956030 at *7 (E.D. Mich. March 15, 2010), to hold that "there is no common law cause of action for discharge in retaliation for internal reporting of violations of law." Goldfaden's first argument with respect to the public-policy tort fails.

The district court did not discuss the second claim, that Goldfaden was punished when "she refused to violate the law by not remaining silent about Mr. Cleveland's conduct and/or by *refusing to falsify Wyeth documents* indicating she was not aware of any violations of federal law or regulations." Amended Comp. at p. 11 (emphasis added).[4]

---

[4] In her reply brief, Goldfaden elaborates on this claim, and states that Wyeth asked her to "participate in, and cover-up, Mr. Cleveland's illegal conduct." *Appellant Reply Br.* at 9. Asking her to cover up illegal conduct is quite different from punishing her for reporting Cleveland's conduct. Because this allegation of a cover-up was not discussed in the record below, we do not consider it. It is unclear exactly what Wyeth would have wanted to cover up, in light of the fact that it punished Cleveland after an investigation.

Goldfaden's own deposition refutes this claim:

Q. Your Complaint also makes an allegation that you --
By My. Curhan: I show that you have about another half hour, just so you know.
By Ms. Laughren:
Q. -- that you refuse to violate the law by not remaining silent about Mr. Cleveland's conduct. Did anybody ever at Wyeth request you to remain silent about Mr. Cleveland's conduct?
A. No.
Q. Did anybody at Wyeth ever ask you to *falsify documents* in regard to Mr. Cleveland's conduct?
A. No.
Q. Did you ever tell—did you ever threaten anyone at Wyeth that you intended to report Mr. Cleveland's conduct to the FDA?
A. No.
...
Q: Outside of your counsel, the EEOC, you never told anyone outside of Wyeth or told anybody at Wyeth that you intended to make an allegation regarding Mr. Cleveland's conduct?
A. Not to my recollection at this moment.
Q: But certainly no threat to go to the FDA and outside of EEOC and your counsel you don't recall anything?
A. No.

R.73-42, SG Dep. pp. 291-292 (emphasis added).

Goldfaden admits that no one asked her to remain silent, or threatened her to get her not to tell the FDA about Cleveland's misconduct. She admits that no one asked her to falsify any documents. In fact, by her own admission, no one even knew whether or not she intended to reveal Cleveland's actions to the FDA. Her own deposition testimony refutes the second argument. This claim fails.

## V

The judgment of the district court is AFFIRMED.